UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x

LINDSAY GRACE WHIDDON,

       Plaintiff,

   -against-

BUZZFEED, INC.,

       Defendant.

——————————————————————————x

No. 22 Civ. 4696 (CM)

**MEMORANDUM DECISION AND ORDER GRANTING MOTION TO DISMISS**

McMahon, J.:

    Plaintiff Lindsey Grace Whiddon ("Whiddon") brings this claim of copyright infringement against Defendant Buzzfeed Inc. ("Buzzfeed").

    Plaintiff is a professional photographer. She took multiple photographs of her friend, social media "influencer" Tiffany Mitchell, before and after a motorcycle accident. Ms. Mitchell created an Instagram post about her accident, which featured these photographs.

    On or about August 19, 2019, Defendant published an article about Ms. Mitchell, specifically about an emerging online controversy about her Instagram post. Embedded within the article were multiple screenshots of Ms. Mitchell's Instagram post, displaying Whiddon's photographs. Plaintiff alleges that, by reproducing three of her photographs without permission, Defendant infringed her copyright in the photographs pursuant to Section 501 of the Copyright Act, 17. U.S.C. § 501 *et seq.* (Count I).

Defendant moves to dismiss Plaintiff's complaint in its entirety, with prejudice, pursuant to Fed. R. Civ. P. 12(b)(6), or in the alternative, for summary judgement pursuant to Fed. R. Civ. P. 12(d), asserting that its use of all three photos constitutes fair use.

Because Defendant was obviously entitled to reproduce the photographs, Buzzfeed's motion to dismiss the Amended Complaint is GRANTED.

## I.   BACKGROUND

### A.  The Parties

Plaintiff Lindsay Grace Whiddon is a professional photographer. She is a citizen of the State of Tennessee and maintains a principal place of business at 6203A California Avenue, in Nashville, Tennessee. (Am. Compl. at ¶ 6).

Defendant Buzzfeed is a Delaware corporation. (Am. Compl. at ¶ 6). Its principal place of business is 111 East 18th Street, New York, New York. Defendant is the owner and operator of a website known as www.buzzfeednews.com (the "Website") and an account on the social media website Facebook known as @BuzzFeed (the "Account") located at www.facebook.com. (Am. Compl. at ¶¶ 3–4). The Account is followed by 13 million users of Facebook. (Am. Compl. at ¶ 15). Defendant is a "popular and lucrative commercial enterprise," and is paid to run sponsored and paid advertisements on the Website and Account. (Am. Compl. at ¶¶ 15, 18, 22). Defendant also sells merchandise on the Website to users of the Website. (Am. Compl. at ¶ 23).

### B.  Photographs and Subsequent Article

On or about July 28, 2019, Whiddon took three photographs of her friend, Nashville-based lifestyle blogger Tiffany Mitchell, ("Photographs"). One of the photos showed Mitchell posing in front of a motorcycle ("Pre-Accident Photograph"), (Am. Compl. at ¶ 24; Am. Compl. Ex. 1), and the two others showed her being cared for in the aftermath of a motorcycle accident

("Post-Accident Photographs"). (Am. Compl. at ¶¶ 33, 39; Am. Compl. Ex. 1). On July 31, 2019,

Mitchell posted these Photographs, among others, to her Instagram. (Am. Compl. Ex. 3, 1). This

posting apparently generated a great deal of controversy on social media.

On or about August 19, 2019, Defendant published an article ("Article") on the Website,

entitled "An Influencer Is Defending Her Decision to Post a Photo Shoot Of Her Motorcycle

Accident on Instagram," authored by "social news reporter" Tanya Chen. The Article was about

Ms. Mitchell's motorcycle accident and the controversy surrounding her social media post about

the accident.  (Am. Compl. Ex. 3). The text of the Article reads as follows:

> A lifestyle blogger based in Nashville is answering to critics who questioned why
> she turned her scary motorcycle accident into an impromptu photo shoot.
>
> Tiffany Mitchell, who has over 211,000 followers on Instagram, told BuzzFeed
> News she "would never turn a very important personal story like this into a brand
> campaign."
>
> "I'm sad that some people are taking it that way," she added, before requesting
> BuzzFeed News not proceed with writing this story as it would "draw negative
> attention."
>
> Mitchell shared the post two weeks ago after she got into a motorcycle accident
> that left her shaken and with minor scrapes. A photographer friend was driving
> alongside taking photos of her at the time. The friend, named Lindsey, then
> continued to snap photos during and after the traumatic event.
>
> All of these photos — including some of Mitchell lying on the road being tended
> to, and one with a bottle of Smartwater — were then shared in a series of
> Instagram photos accompanied by a lengthy caption.
>
> Mitchell described the incident as "unreal," and described a scene where after she
> was thrown off her bike, strangers tended to her and helped load her bike on a
> trailer.
>
> "We all drove back to my house with a green light from angels that cleaned me up
> in the ambulance, sat with our new friends listening to music and laughing until I
> fell asleep," she wrote.
>
> She wrote that she lost a partner to a motorcycle accident three years ago, so the
> accident especially affected her.

"I'm resting and healing up my arm, and @ianwhitetattoos may need to touch up my wildflowers, but I am feeling so much better," she concluded the long caption.

A lot of people sent her well wishes and flooded her comments with warm thoughts. (Mitchell has since archived the post after more negative comments began rolling in.)

However, the comments then became mixed with more critical and cynical observations. For one, people were taken aback by the optics of taking, and then sharing, professional-grade photos of her actual accident.

"This must have been super scary and I'm glad you're okay, but... if my friend continued to take photos while I was lying semi-unconscious in the road, I'd be furious. I love your photos but it's a little weird to include those," one wrote.

"How are people commenting on this like it's normal?" another wrote.

Some even accused her of posing for them.

To those accusations, Mitchell said that's simply not true.

"Nothing about this was staged. I'm sad that some people are taking it that way, but it's just not the case," she said.

"I didn't know she was taking them, but later on when she showed them to me I was so grateful that she captured such an intense moment for me."

The post also made its way to Reddit's /r/blogsnark subreddit, where one user wrote, "Genuinely I am perplexed by the idea of a friend snapping angles right next to your head post-motorcycle crash. What the fuck?!"

Her followers then began to question if the bottle of Smartwater was intentionally placed beside her as she was lying on the pavement. "Paid in partnership with Smartwater..." one commenter said cheekily.

Mitchell denied any paid or branded deal with the water company. Smartwater later confirmed to BuzzFeed News that they do not have a partnership with her.

"I would never turn a very important personal story like this into a brand campaign," she stated, adding that "the water was given to me while I was resting."

Mitchell maintains the post was well-intended.

"All motives for taking the photos and sharing them along with the details of the experience were good," she said.

"I'm really sad that raising this topic without all the context may inspire negativity and hatred, but I did my best and hope whatever happens can add to people's lives in some way."

(*Id.*)

At several points in the article, screenshots of Ms. Mitchell's Instagram post ("Post") are embedded between paragraphs of the Article's text. The screenshots of the Post are composed of two distinct panels. The left panel of each screenshot displays a different photograph from the Post, including each of the three Photographs. The right panel of each screenshot displays the caption that Ms. Mitchell wrote to accompany the Post, with each screenshot displaying a different portion of the caption so that the entire caption may be read. The Article also features screenshots of comments left by Instagram users on the Post. All of the screenshots are credited to "Instagram.com" or "Instagram".

On or about August 30, 2019, Whiddon first saw the Photographs on the Website, featured in the Article. (Am. Compl. at ¶¶ 27, 36, 42). On or about September 5, 2019, Whiddon applied to the U.S. Copyright Office ("USCO") to register each of the Photographs, under Application Numbers 1-8040359721. (Am. Compl. at ¶¶ 25, 34, 40).[1] On or about September 17, 2019, USCO determined that the Photographs qualified for registration, and were registered under Registration No. VA 2-169-496, effective September 5, 2019.  (Am. Compl. at ¶¶ 26, 35, 41; Am. Compl. Ex. 4, 1).

---

[1] Richard Liebowitz applied for the copyright certification on behalf of Whiddon, on or about September 5, 2019. (Am. Compl. Ex. 4, 3).

On or about July 18, 2022, Whiddon again saw the Pre-Accident Photograph, displayed on the Account. The Account's post was dated from three years earlier – August 20, 2019, the time when the Article was published. (Am. Compl. at ¶ 30).

The Complaint alleges that (1) Whiddon did not grant permission, authorize, or otherwise assign any of her exclusive rights in the Photographs to the Defendant. (Am. Compl. at ¶ 47), (2) Plaintiff believes each of the screenshots features exact copies of the entirety or majority of the original Photographs, (Am. Compl. at ¶ 50), (3) the Defendant controls the content posted on Website and Account, (Am. Compl. at ¶ 51), (4) the Photographs were posted by employees of the Defendant and not at the direction of a user of the Website or social media website Facebook. (Am. Compl. at ¶¶ 53–54; 56). Plaintiff believes the display of the Photographs increased the number of individuals visiting Website and Account, for a period of time, causing Defendant to realize an increase in advertising revenue and/or merchandise sales. (Am. Compl. at ¶ 61). A number of major media outlets also published the Photographs and the story of the controversy on their own websites, providing credit to the Defendant, not to the Plaintiff. (Am. Compl. at ¶ 66). To date, Defendant has not removed the Photographs from Website or Account. (Am. Compl. at ¶ 68).

### C. Procedural History

Plaintiff filed this lawsuit on June 6, 2022, alleging one count of copyright infringement pursuant to 17 U.S.C. § 501. (Dkt. No. 1). Defendant filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) on July 8, 2022.  (Dkt. No. 12).

Plaintiff filed a First Amended Complaint as of right pursuant Fed. R. Civ. P. 15(a)(1)(B) on July 22, 2022.   (Dkt. No. 18). In the First Amended Complaint, Plaintiff withdrew her claim

of copyright infringement as to the "SmartWater Photograph", (Pl. Opp. 7, Dkt. No. 26) and provided additional exhibits. (Dkt. No. 18).

Defendant again filed a motion to dismiss for failure to state a claim upon which relief can be granted on July 29, 2022. (Dkt. No. 20). Defendant argues for dismissal or, in the alternative, summary judgement pursuant to Fed. R. Civ. P. 12(d), on the sole ground that its use of the Photographs is a prima facie case of fair use. (Def. Mot. to Dismiss 1, Dkt. No. 21).

## II.   DISCUSSION

### A.  Standard for a Rule 12(b)(6) Motion to Dismiss

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[A]ll reasonable inferences should be drawn in favor of the plaintiff," but the "complaint must contain sufficient allegations to nudge a claim 'across the line from conceivable to plausible.'" *Sphere Digital, LLC v. Armstrong*, No. 20-cv-4313 (CM), 2020 WL 6064156, at *4 (S.D.N.Y. Oct. 14, 2020) (quoting *Twombly*, 550 U.S. at 555). Where a plaintiff fails to "nudge[] their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570. Federal Rule 12(b)(6) "does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of" the truth of the allegations. *Id.* at 545.

In reviewing a motion to dismiss, a court may consider, inter alia, (1) documents that are incorporated by reference into the complaint, and (2) documents that, even if not incorporated by reference, the defendant has notice of and that are 'integral' to the complaint" without converting

the motion to dismiss to a motion for summary judgment. *BankUnited, N.A. v. Merritt Envtl. Consulting Corp.*, 360 F. Supp. 3d 172, 183 (S.D.N.Y. 2018) (citing *Weiss v. Inc. Vill. Of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011)); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir. 1991). Because the Photographs, alleged infringing displays of Photographs in Defendant's Article on the Website, alleged infringing display of the Pre-Accident Photograph on the Account, Defendant's Article, and Plaintiff's copyright registration are all incorporated by reference and integral to the Amended Complaint, I may consider those items without converting the motion to dismiss to a motion for summary judgement. While the Court must draw all factual inferences in favor of the Plaintiff, the Court need not accept the party's characterizations of those items, as "the works themselves supersede and control contrary descriptions of them" contained in the pleadings or elsewhere. *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010).

### B. Buzzfeed's Use of the Photographs is Fair Use

As the Supreme Court has explained, the overriding purpose of copyright is "'[t]o promote the Progress of Science and useful Arts....'" *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 574 (1994) (quoting U.S. Const. Art. I, § 8, cl. 8). The Copyright Act advances this purpose by permitting the public to draw upon copyright materials without the permission of the copyright holder in certain circumstances. *See* 17 U.S.C. § 107. Section 107 requires a court to consider the following four nonexclusive factors, which are to be weighed together, to assess whether a particular use is fair:

1. The purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
2. The nature of the copyrighted work;
3. The amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

4.  The effect of the use upon the potential market for or value of the copyrighted work.

*Id.* "The determination of fair use is a mixed question of fact and law," *Swatch Grp. Mgmt. Serv. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014), and is an "open-ended and context-sensitive inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006).

Fair use is an affirmative defense, so Defendant bears the burden of showing that a given use is fair. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015). Courts may adjudicate an affirmative defense on a motion to dismiss "where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)).

"Accordingly, when 'the only two pieces of evidence needed to decide the question of fair use' are 'the original version' and the allegedly infringing version, it is proper to decide the issue on a motion to dismiss." *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (citing *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013)); *See also Clark v. Transp. Alts., Inc.*, No. 18-cv-9985 (VM), 2019 WL 1448448, at *2 (S.D.N.Y. Mar. 18, 2019). And while Defendants bear the burden of proving that their use was fair, "they need not establish that each of the factors set forth in § 107 weighs in their favor." *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 476–77 (2d Cir. 2004) (internal citation omitted).

*i.*    *Defendant's Reporting on the Online Controversy was Transformative*

The first statutory factor, the purpose and character of the use, is "the heart of the fair use inquiry." *Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006). As a result, if the new work is "substantially transformative," the "other factors, including commercialism, are of less significance." *Id.* Courts within the Second Circuit examine at least two sub-factors to determine

the purpose and character of use, whether the secondary use is: (1) transformative; and (2) for commercial purposes. See *NXIVM Corp. v. Ross Inst.*, 364 F.3d at 478.

For a secondary use to be "transformative" it must "add something new, with a further purpose or different character, altering the first with new expression, meaning or message[.]" *Cariou v. Prince*, 714 F.3d at 705 (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994)). The Copyright Act suggests that the display of a copyrighted image may be transformative "where the use serves to illustrate criticism, commentary, or a news story *about that* work." *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017) (citing 17 U.S.C. § 107) (emphasis in original). There is a strong presumption that the first factor favors a defendant if the allegedly infringing use is for one of those purposes, *NXIVM Corp. v. Ross Inst.*, 364 F.3d at 477 (*citing Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991)), but not if the use is merely to provide an illustrative aid depicting a person or event described in the writing. *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d at 352; *see also BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 404–405 (S.D.N.Y. 2016).

As a result, courts have found transformative a reporter's use of a screenshot of a controversial online article to accompany a critique of the article, *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 544 (S.D.N.Y. 2019), a news outlet's broadcast of a sensational video clip in a news report about the video, *Konangataa v. Am. Broadcasting Companies, Inc.*, No. 16-CV-7382 (LAK), 2017 WL 2684067, at *1 (S.D.N.Y. June 21, 2017), and a newspaper's "depiction of a controversial photograph" alongside commentary about the controversy caused the photograph. *Nunez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2000).

Buzzfeed argues that its use of the three Photographs is transformative, because the Photographs help to explain a controversy involving Ms. Mitchell's social media post, and the Photographs contained therein. (Def. Mot. to Dismiss 11, Dkt. No. 21). Buzzfeed's Article reports on the negative comments that Ms. Mitchell's social media post triggered, the critique of the post and Photographs as "staged," and the allegations that the post was sponsored by a corporation, SmartWater. *Id.* It contends that the full reproductions of the Photographs, embedded within the larger screenshots of the Post, were part of a news commentary that should be considered fair use. *Id.*

Upon review of the three Photographs, and even drawing all reasonable inferences in Ms. Whiddon's favor, Buzzfeed has persuaded the Court that its use of the Photographs is transformative. Therefore, the factor favors Buzzfeed.

The Defendant reproduced the Photographs in the context of its report on the controversy that had arisen around Ms. Mitchell's social media post. That is a far different purpose than the one for which the Plaintiff took the pictures or Ms. Mitchell used them. Ms. Whiddon took the Photographs for their contents, to depict Ms. Mitchell and her later motorcycle accident. Ms. Mitchell's Instagram Post depicts the story of her accident. But Buzzfeed reported on the resulting online controversy over Ms. Mitchell's Post, and presented the screenshots of the Post, which included the Photographs, so readers could consider whether the motorcycle accident appeared staged and/or the product of an advertising partnership. "Defendant's inclusion of the Photograph as part of the Post was not simply to 'present the content of that image.'" *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 583 (S.D.N.Y. 2020), reconsideration denied, 565 F. Supp. 3d 400 (S.D.N.Y. 2021) (quoting *Gossip Cop Media, Inc.*, 196 F. Supp. 3d at 407).

Buzzfeed's use of the Photographs informed readers and prompted them to consider whether Ms. Mitchell's Post and her accident were inauthentic.

Defendant's Article explains the online controversy around Ms. Mitchell's Instagram post: initially Ms. Mitchell's Post received comments of support, but soon comments became more cynical, and Ms. Mitchell became the target of significant public criticism and accusations. The Article intersperses various screenshots of the controversial Post and Instagram users' comments throughout the commentary. The screenshots of the Post juxtapose the Photographs with Ms. Mitchell's narrative of the motorcycle accident. The Instagram comments illustrate the public reaction. By presenting the two sides of this controversy through the screenshots, the reader understands why the public is reacted to the Post as it did. The screenshots of the Post and Photographs then enhance the ability of the reader to understand the text, *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 609 (2d Cir. 2006), and allow the reader to form an opinion on the Post.

The author could not have simply reproduced the negative comments, as the comments alone would not have explained why the Instagram users felt the way they did. In one case, a user comments, "Huh? You had a serious accident but people were there to take *~stunning*~ photos? This is an insult to people who get into accidents. Put a helmet on." (Compl. Ex. 3, 3). The reader understands why the commentator accuses Ms. Mitchell of glamorizing motorcycle accidents with the Photographs, because they can see the "stunning" Photographs and Ms. Mitchell's accompanying narrative. No other images could serve the same purpose as the screenshots in the Post, *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 583 (S.D.N.Y. 2020), reconsideration denied, 565 F. Supp. 3d 400 (S.D.N.Y. 2021) (citing *Clark v. Transportation Alternatives, Inc.*, 2019 WL 1448448, at *4 (S.D.N.Y. 2019).

Courts in this Circuit have specifically considered whether reporting on a controversial social media post is a sufficiently transformative purpose to make a full reproduction of the post and its copyrighted material fair use. When an individual's decision to disseminate an Instagram post is the "very thing the article [is] reporting on," the use of the Instagram post and its copyrighted material in the reporting has been deemed sufficiently transformative to support a fair use defense. *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 581 (S.D.N.Y. 2020), reconsideration denied, 565 F. Supp. 3d 400 (S.D.N.Y. 2021); *Boesen v. United Sports Publications*, Ltd., No. 20CV1552ARRSIL, 2020 WL 6393010, at *4 (E.D.N.Y. Nov. 2, 2020), reconsideration denied, No. 20CV1552ARRSIL, 2020 WL 7625222 (E.D.N.Y. Dec. 22, 2020).

Moreover, reproductions of a social media post are clearly used for the purposes of reporting on the post where, as here, the reproductions include the accompanying elements of the social media application, such as the frame of the Instagram application and standard Instagram hyperlinks. *Walsh*, 464 F. Supp. 3d at 583–84. The focus of the article is Ms. Mitchell's decision to disseminate the Photographs of her accident, and the resulting critique of that decision. Buzzfeed's use of screenshots, which include all the elements of the Post, such as the Instagram branding and Ms. Mitchell's caption, make absolutely clear that the focus of its reporting is on the Post and the controversy.

Plaintiff argues that the use of the Photographs is not transformative because she believes one photograph is used only for a descriptive purpose and the other two are not related to the controversy. Plaintiff claims that the use of the Pre-Accident Photograph is only descriptive, to show Ms. Mitchell before the accident. (Pl. Opp. 16–17). Plaintiff also contends that the subject of the online controversy was whether Ms. Mitchell staged the accident in the Post for a sponsored advertisement with SmartWater. *Id.* at 17. Having withdrawn her claim for copyright

infringement on the photo prominently featuring the SmartWater bottle, she claims that the remaining two Post-Accident Photographs, which do not prominently feature a SmartWater product, serve no function in a commentary on the controversy. *Id.* at 17–18.

These arguments are not persuasive. The Pre-Accident Photograph is the first photograph in the Post. The Defendant did not merely use the Pre-Accident Photograph as a generic image of Ms. Mitchell, just to accompany the Article, *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016). Rather, the Pre-Accident Photograph provides the reader with insight into the aesthetic choices of the earlier, staged photoshoot. The juxtaposition with the Post-Accident Photographs allows the reader to consider whether the later photographs appear to be a continuation of the photoshoot and to assess the credibility of Ms. Mitchell's comments that they were not staged.

The topic of the controversy is also not limited to the whether the Post was sponsored by Smartwater. The Article is titled "An Influencer Is Defending Her Decision To Post a Photoshoot Of Her Motorcycle Accident on Instagram." The Article's reporting on the allegations that the social media post was sponsored by SmartWater is limited to a few sentences of the whole article. The bulk of the article is devoted to remarks by Ms. Mitchell and comments by Instagram users, criticizing the Plaintiff's choice to take photographs after the accident, questioning the sensitivity of seeming to glamorize a motorcycle accident, and alleging that Ms. Mitchell staged the Post-Accident photographs. As a result, the Post-Accident Photographs are perfectly appropriate to help explain why critics are making those accusations.

In short, the use of all three Photographs is necessary and appropriate for reporting on the controversy.

Finally, Plaintiff emphasizes that Defendant is a "popular and lucrative commercial enterprise," and contends that the Defendant profited from the publishing of her Article and replication of Plaintiff's Photographs.

"The fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use." *See Swatch Grp. Mgmt. Serv. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 83 (2d Cir. 2014).; *Harper & Row*, 471 U.S. at 562, 105 S.Ct. 2218. However as, "[a]lmost all newspapers, books and magazines are published by commercial enterprises that seek a profit," courts discount this consideration where the link between commercial gain and the copying is attenuated. *Swatch*, 756 F.3d at 83 (quoting *Consumers Union of U.S., Inc. v. Gen. Signal Corp.*, 724 F.2d 1044, 1049 (2d Cir.1983). Moreover, when the use of copyrighted material is highly transformative, a defendant's use of copyrighted material for profit bears less weight. *Blanch*, 467 F.3d at 254.

Here, Plaintiff claims that the Defendant's article prompted a greater number of people to visit its Website, causing an increase in revenue from advertising and merchandise sales. However, by Plaintiff's own description, Defendant is a "popular and lucrative commercial enterprise" and its Account is followed by 13 million Facebook users, so it is doubtful that the copying of the Photographs led to any appreciable change in revenue from advertising contracts or made readers of the Article more inclined to purchase the Defendant's merchandise. However, that raises a question of fact. What does not raise a question of fact is that Defendant's use of the Photographs was transformative, which outweighs the commercial nature of the use – even if Defendant could be shown to have profited specifically from the Photos' publication.

ii.     *The Photographs are Creative*

The second statutory factor favors the Plaintiff, but not decidedly so. This factor, "the nature of the copyrighted work," "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994). Courts have generally adopted two types of distinctions in their analysis of the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower. *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006).

"Photographic images of actual people, places and events may be as creative and deserving of protection as purely fanciful creations." *Monster Communications, Inc. v. Turner Broadcasting*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996). However, courts traditionally have also afforded this factor little weight, characterizing it as "rarely [] determinative." *On Davis v. The Gap, Inc.*, 246 F.3d 152, 175 (2d Cir. 2001); *accord Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 102 (2d Cir. 2014); *Hirsch v. CBS Broad. Inc.*, No. 17 CIV. 1860 (PAE), 2017 WL 3393845, at *6 (S.D.N.Y. Aug. 4, 2017)

The Photographs of Ms. Mitchell clearly demonstrate features of creativity. The Pre-Accident Photograph displays Ms. Mitchell in a posed position, with light and shadow incorporated in specific ways. The Post-Accident Photographs showcase the emotion and drama of the motorcycle accident through manipulation of the camera focus and the capture of the accident at multiple angles. This Court need not accept Ms. Mitchell's contentions that the

Photographs were not staged, nor reach any conclusion at all about the veracity of the social media post; the Photographs are expressive and display creativity. However, under these circumstances, the Court assigns this second statutory factor much less heft than the first.

    *iii.*   *Defendant's Reproduction was Reasonable for its Transformative Purpose*

   Substantively, the third factor considers "whether the quantity and value of the materials used, are reasonable in relation to the purpose of the copying." *Blanch v. Koons*, 467 F.3d 244, 257 (2d Cir. 2006) (quoting *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 586 (1994)). This inquiry focuses, not on how much of the secondary work comprises the original, but on the proportion of the work used, whether the defendant used more than was necessary, and the "purported justifications" for the use. *HathiTrust*, 755 F.3d at 96. A secondary work may copy the original in its totality where a full copy is reasonably appropriate to the secondary work's transformative purpose. *Authors Guild v. Google, Inc.*, 804 F.3d 202, 221 (2d Cir. 2015).

   For many of the same reasons discussed earlier, this factor favors Buzzfeed. Buzzfeed used the entirety of the Photographs. Plaintiff argues that Buzzfeed did not need to use the three Photographs in controversy, because only the photograph displaying the SmartWater bottle was necessary to comment on the controversy about whether the Post was sponsored by SmartWater.

   However, as mentioned, the Article is about more that the accusation that the Post was sponsored. It discusses the accusations that the Post and Photographs appeared staged, and criticisms that the Post displayed a subject as serious as a motorcycle accident in an artistic or even glamorous manner. Buzzfeed could not have displayed anything less than the entirety of the Photographs, nor edited the Screenshots to reduce the visible portions of the Photographs. Reducing the amount of the original work would have provided an incomplete description of the controversy, or even misrepresented the Post. "In the context of news reporting and analogous

activities . . . the need to convey information to the public accurately may . . . make it desirable and consonant with copyright law for a defendant to faithfully reproduce an original work without alteration." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 84 (2d Cir. 2014). The entirety of each Photograph in the Post was necessary to provide the full context of the subject of the controversy. Accordingly, the third factor favors Buzzfeed.

> iv.    *Defendant's Use Did Not Compete with the Plaintiff's Work*

The fourth statutory factor, the "effect of the use upon the potential market for or value of the copyrighted work," looks to "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018) (citation and quotation marks omitted), cert. denied, 139 S. Ct. 2760 (2019).

As mentioned, the Photographs appeared within screenshots of the Post. The screenshots of the Post do not compete with the Photographs in any market for photographs of women posing with motorcycles or any market for photographs of women who have been involved in motorcycle accidents. It is highly unlikely that someone looking to license the Photographs for their contents would seek a license from the Defendant over the Plaintiff. In addition, Plaintiff provided the Photographs to Ms. Mitchell for her to share with her followers on Instagram, a platform premised on freely sharing images with as many people as possible. The Plaintiff's willingness to share the Photographs with a potentially massive group of people cuts against any suggestion that she had plans to commercialize the Photographs.

Plaintiff argues, citing *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 432 (S.D.N.Y. 2018), that she had the right to sell the Photographs to media outlets writing about the

story and the use by the Defendant destroyed any licensing market she might have otherwise entered. In *Otto*, the plaintiff took a photograph of then-President Donald Trump attending a wedding at the Mar-a-Lago hotel. After certain media outlets republished the photograph, the plaintiff belatedly decided he wished to commercialize the photo himself. The court rightfully recognized that the plaintiff's failure to immediately capitalize on the photograph should not preclude him from future profits.

There are critical differences between the market effect in *Otto* and the market effect here. First, there is no indication within Plaintiff's Complaint that at any point she intended to license the Photographs. Plaintiff notes that there was a clear commercial licensing market because multiple media outlets would go on to publish the Photographs and accompanying stories on the controversy. However, at no point does the Plaintiff indicate that she actually attempted to enter the market or ever had any intention of entering the market. The court in *Otto* rightfully recognized that a copyright holder should not be denied compensation just because he failed to quickly monetize his work. *Otto*, 345 F. Supp. 3d at 432. But it did not suggest that a plaintiff can shake down a news organization for a licensing payment for a copyrighted work that she never intended to license.

Even drawing all inferences in Plaintiff's favor, it begs credulity that the Plaintiff would have ever wanted to license her photographs for use in articles raising public awareness of a controversy surrounding her friend and subjecting the Plaintiff herself to significant online criticism. Where a "[p]laintiff had no intention of entering the market," the fourth factor weighs in favor of the defendant. *Otto*, 345 F. Supp. 3d at 432 (citing *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 91 (2d Cir. 2014).

Moreover, the Second Circuit had made clear that the possibility of lost licensing revenue is not sufficient to claim an impact on the marketability of a copyright, *Otto*, 345 F. Supp. 3d at 432 (citing *Ringgold v. Black Entm't Television*, Inc., 126 F.3d 70, 81 (2d Cir. 1997)), "[o]nly an impact on potential licensing revenues for traditional, reasonable, or likely to be developed markets should be legally cognizable." *Id.* (*Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 930 (2d Cir. 1994))

At the moment the plaintiff in *Otto* took the photograph, it was clear that the photograph would have a market for its contents. News organizations reporting on the President's attendance of the wedding would want to license a photograph of the President in attendance. Here, Plaintiff cannot reasonably claim that this secondary use market, a media firestorm about her friend's controversial social media post, was "traditional, reasonable, or likely to be developed."

As the Defendant's use plainly had and has no effect on any market for the Plaintiff's photographs of Ms. Mitchell, this factor supports fair use.

Having considered all four fair use factors, three of which counsel for fair use and one of which counsels against, but is afforded significantly less weight, the Court finds that the Defendant's use of the Photographs constitutes fair use. This case must be dismissed.

As a result, this Court need not reach the issue of whether Plaintiff's copyright was validly registered.

## CONCLUSION

For the foregoing reasons, the Defendant's s motion to dismissed is GRANTED.

Dated: October 31, 2022

_____
U.S.D.J.

TO ALL PARTIES BY ECF